UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LAWRENCE HALLARON III                             CIVIL ACTION

VERSUS                                            NO. 12-2051

CAROLYN W. COLVIN, ACTING                         SECTION "R" (2)
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION[1]


**FINDINGS AND RECOMMENDATION**

Plaintiff, Lawrence Hallaron, III, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), upholding cessation of plaintiff's supplemental security income benefits ("SSI") under Title XVI of the Act. 42 U.S.C. §§ 405(g), 1381 et seq. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).

Instead of filing a memorandum of facts and law as ordered, Record Doc. No. 13, plaintiff filed a motion for summary judgment. Record Doc. No. 15. Defendant filed a timely reply memorandum of facts and law. Record Doc. No. 17.

---

[1]Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Colvin is automatically substituted for the former Commissioner of Social Security, who was the original named defendant.

## I.   PROCEDURAL HISTORY

Hallaron began receiving SSI in 1987, based on a determination that he had a mental impairment that met one of the listed impairments in 20 C.F.R. Part 4, Subpart P, Appendix 1.  In August 1997, his benefits were continued after a continuing disability review.  This most recent medical determination rendered in plaintiff's case is the comparison point decision.  20 C.F.R. § 416.994(b)(5).  The Commissioner cannot locate this decision or the evidence upon which it was based.  (Tr. 148).

On August 7, 2009, a second continuing disability review found that Hallaron's disability had ceased as of August 1, 2009.  (Tr. 33-34).  On June 24, 2010, a disability hearing officer upheld the cessation of benefits based on "the Group II exception to Medical Improvement for Fraud or Similar Fault."  (Tr. 31-32, 154).

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on July 6, 2011.  (Tr. 572-93).  On August 25, 2011, the ALJ issued a decision holding that plaintiff was not disabled between August 1, 2009, the benefits cessation date, and the date of the decision.  (Tr. 12-24).  After the Appeals Council denied review on June 27, 2012, the ALJ's decision became the final decision of the Commissioner for purposes of this court's review.  (Tr. 5-7).

II.   STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.   The ALJ's determination that plaintiff's disability ceased is legally impermissible under 20 C.F.R. § 416.994(b)(2)(iv)(E) and (b)(5)(iv) because the prior file was lost and not reconstructed, and no exception to the medical improvement standard applies.

B.   The "fraud" label on the front of the case file deprived plaintiff of a neutral and objective hearing and decision, in violation of 20 C.F.R. §§ 416.994(b)(1)(vi), 416.994(b)(5) and 498.204(a).

C.   The ALJ erred by accepting the lay observations of the Cooperative Disability Investigations Unit of the Office of the Inspector General over the medical findings and opinions of the psychological consultative examiner, in violation of 20 C.F.R. § 416.927(c) and SSR 06-03p.

III.   ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following relevant findings:

1.   The most recent favorable decision was rendered in 1997, but the file containing the evidence used in that decision cannot be located.

2.   The August 6, 2009 investigative report by the Cooperative Disability Investigations Unit of the Office of the Inspector General does not establish that Hallaron fraudulently obtained benefits in 1997.  Thus, the Group II exception for fraud is not clearly applicable and medical improvement review considerations should continue.

3.   Current review of all available documentation does not yield a clear indication of the evidence or conclusion on which the most recent favorable determination was based.

4.   Assessment of continuing disability is based on a multi-step sequential evaluation using the medical improvement review standard, which includes consideration of the findings in the comparison point decision.  If the comparison point decision file cannot be located, the ALJ must first

3

determine whether there is evidence of current disability. Based on all the evidence, claimant has not been under a disability since August 1, 2009, and the ALJ will perform a full sequential evaluation pursuant to the procedures in 20 C.F.R. § 416.920(a).

5.    Hallaron has not engaged in substantial gainful activity since August 1, 2009, the date his disability was determined to have ceased.

6.    He has severe impairments, consisting of degenerative cervical changes and status post-carpal tunnel release.

7.    Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 4, Subpart P, Appendix 1, including specifically Listing 1.04 for disorders of the spine and Listing 11.14 for peripheral neuropathy.

8.    He has the residual functional capacity to perform a limited range of light work, including using his fingers for precise work up to two-thirds of a work day, provided that he is not required to use his hands continuously. He is limited to standing and/or walking in 45 to 60 minute increments for four to five hours and sitting for up to six hours in an eight-hour work day.

9.    These limitations comport with the overall light range of limitation assessed by the state medical consultant who reviewed this claim in August 2009, whose assessment is accorded the full weight due to a non-examining physician of record.  SSR 96-6p.

10.   Although plaintiff's medically determinable impairments could reasonably be expected to cause symptoms, his statements concerning the intensity, persistence and limiting effects of these symptoms are not credible and lack any substantive support in the record.

11.   Hallaron has no past relevant work and has a limited education.  He was 44 years old, which is defined as a "younger individual age 18-49," on the date his disability was determined to have ceased, and is currently 46 years old.

12.   Considering his age, education, lack of past relevant work experience and residual functional capacity, jobs exist in significant numbers in the national economy that plaintiff can perform.

4

13.     If Hallaron had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.20.   However, his ability to perform all or substantially all requirements of this level of work has been eroded by additional limitations.

14.     Based on the testimony of the vocational expert that a person with plaintiff's age, education, work experience and residual functional capacity can perform jobs at the light level, such as receptionist/information clerk, general office clerk and bookkeeping clerk, that exist in significant numbers in the national economy, a finding of "not disabled" is appropriate under the framework of the above-cited rule.

15.     Hallaron has not been under a disability from August 1, 2009, the date his disability was determined to have ceased, through the date of the ALJ's decision.

(Tr. 13-23).

## IV.   ANALYSIS

### A.     Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971);

<u>Perez</u>, 415 F.3d at 461; <u>Loza</u>, 219 F.3d at 393.  This court may not "reweigh the evidence in the record, try the issues <u>de novo</u> or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." <u>Newton v. Apfel</u>, 209 F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  <u>Id.</u>

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  <u>See</u> <u>Arkansas v. Oklahoma</u>, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  <u>Perez</u>, 415 F.3d at 461.  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  <u>Id.</u>; <u>Newton</u>, 209 F.3d at 452; <u>Martinez v. Chater</u>, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for SSI, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A).

A previous finding that an individual is "under a disability" for purposes of the Act is periodically reviewed.  A determination that a disability has ended may result in termination of benefits.  <u>Id.</u> § 421(i); 20 C.F.R. §§ 416.994. 416.1331.

Social security disability benefits are terminable when the claimant's condition improves to the point that he is no longer disabled. When benefits are terminated, the claimant has the burden of proving the continuation of disability, but if the Secretary does not contest the original finding of disability, there is a presumption that the prior disability continues. . . . "[O]nce evidence has been presented which supports a finding that a given condition exists it is presumed in the absence of proof to the contrary that the condition has remained unchanged." Accordingly, in a termination of benefits case in which the original determination of disability is not challenged, the government must present some evidence of improvement. Nevertheless, the claimant retains the ultimate burden of persuasion as to the continuing nature of the disability if adequate proof of improvement is offered.

Byerly v. Heckler, 744 F.2d 1143,1144-45 (5th Cir. 1984) (quoting Buckley v. Heckler, 739 F.2d 1047, 1049 (5th Cir. 1984)) (citing Simpson v. Schweiker, 691 F.2d 966 (11th Cir. 1982); Crosby v. Schweiker, 650 F.2d 777 (5th Cir. 1981); Rivas v. Weinberger, 475 F.2d 255, 258 (5th Cir. 1973)) (emphasis added).

The basis for the presumption of continued disability "is that a prior determination of disability is binding on all parties to the hearing and has a res judicata effect as to that record." Gill v. Heckler, 740 F.2d 396, 397 (5th Cir. 1984) (citing Byerly, 744 F.2d at 1048); 20 C.F.R. §§ 404.905, 416.1455 (1983)). The presumption is rebuttable by proof of improvement. Id. (citing Byerly, 744 F.2d at 1048).

To determine whether a previously granted disability has ceased,

the ALJ must apply the medical improvement standard. An ALJ may appropriately discontinue disability benefits when there is substantial evidence that "(1) there had been a medical improvement related to the ability to work, and (2) the individual is now able to engage in substantial gainful activity." A "medical improvement" is any decrease in the medical

<u>severity of an impairment that was present at the time of the most recent</u>
<u>favorable disability determination</u>. A medical improvement is related to a
claimant's ability to do work when there has been a decrease in the
claimant's impairment and an increase in the claimant's functional capacity
to do basic work activities. A finding that there has been a decrease in
medical severity must be based on changes in the symptoms, signs, or
laboratory findings associated with the impairment. The Commissioner has
the burden of proving the claimant is no longer disabled as of the cessation
date.

<u>Garza v. Astrue</u>, No. 3:11-cv-3545-G-BN, 2013 WL 796727, at *4 (N.D. Tex. Feb. 7,

2013), <u>report & recommendation adopted</u>, 2013 WL 818723 (N.D. Tex. Mar. 5, 2013)

(quoting <u>Teague v. Astrue</u>, 342 F. App'x 962, 963-64 (5th Cir. 2009)) (citing 20 C.F.R.

§§ 416.994(b)(1)(i), 404.1594(b)(3)), 416.994(b)(1)(I)); <u>Waters v. Barnhart</u>, 276 F.3d

716, 718 (5th Cir. 2002); <u>Gardner v. Astrue</u>, No. 4:10-cv226, 2011 WL 2292179, at *3

(N.D. Tex. Apr. 19, 2011)) (footnote omitted) (emphasis added).

    B.    <u>Factual Background</u>

    At the outset of the hearing, the ALJ stated that the file had "a big red sheet"

stapled to it

and in the middle of this sheet we have the word fraud. I want it noted for
the record that that is not my doing. I have no idea why it's there.
I assume it might mean Mr. Hallaron is being investigated by somebody for
something, but I want it stated for the record that it doesn't influence me in
any way, and I have absolutely no problem approaching this case with an
open mind. So whatever that's about, we leave it to whoever it is that's
doing what they're doing, but it's not me. So I don't know.

(Tr. 574-75).

When the ALJ asked whether plaintiff was aware that he was being investigated for fraud, Hallaron said he was.  He explained that he is "wheelchair bound.  I have a wheelchair that I use, and also I have a walker prescribed by my doctor.  And they told me I was not supposed to be picking up my wheelchair, and they took pictures of me picking up my wheelchair." (Tr. 575).  He said "they" were the "CDI investigators" from Social Security.  He stated that he was separated from his wife, who took pictures of him picking up his wheelchair and putting it in a car, and filed a fraud complaint against him. (Tr. 575-76).  Plaintiff said he picked up the wheelchair because the nurse who takes care of him had sickle cell anemia, was pregnant and was not supposed to pick up anything over 10 pounds, so he was helping her.  He stated that he did not know whether that investigation had been resolved or was still ongoing, but he was still receiving benefits.

When asked whether his benefits award was originally based on bipolar disorder, Hallaron said he could not remember because he has been on disability for more than 20 years.  (Tr. 576).  He stated that he had tried to work once in a clerical job for Louisiana Rehabilitation Services, but could not remember for how long.  The ALJ then realized that plaintiff had not yet been sworn and administered the oath.  (Tr. 577-78).

Hallaron testified that he was 49 years old[2] and had completed the ninth grade. When asked if he was able to read and write, he replied, "At times."  (Tr. 578-79).  He testified that it depended on several factors, including that he is on medication and wears

---

[2]According to the record, Hallaron was 46 years old on the date of the hearing.

glasses to read.  He stated that he had an eye injury, in which his eyes were accidentally burned by welding when railings were being installed in front of his house.  He said his ophthalmologist told him that he will eventually go blind as he gets older.  He testified that he buys his reading glasses at Walgreen's because prescription glasses would cost about $400, which he cannot afford.  (Tr. 579-80).  He said the reading glasses work "sometimes."

Plaintiff stated that he sleeps a lot because of his "medications and a lot of other factors."  When asked what he does when not sleeping, he complained that the home health care staff for himself and his cousin Martin, who is also disabled, are terrible and do not do what they are supposed to do.  When asked again what he does on a typical day, he said there is not much he can do, except watch the television news and read some of the newspaper.  (Tr. 580-81).  He testified that he does not read the entire newspaper, but just reads important facts that he wants to know, so he can keep tabs on what is going on in the community and society.  He said he does not read books, which make him fall asleep because they are so depressing and boring.

Hallaron testified that his home health care staff comes in from 8:00 a.m. until 3:00, 4:00 or 5:00 p.m.  He said he was not sure when they leave because he is usually asleep.  He stated that the health aide cooks meals for him and his cousin and helps him to bathe, groom, brush his teeth and ambulate.  (Tr. 581-82).  He testified that he falls

without warning, has knocked out several teeth and has injured himself badly by falling. He said the aide makes sure he does not fall.

Plaintiff said he does not cook because he gets dizzy and faint from the heat and that his blood pressure medicine makes him very sick at times. He stated that he has tried to cook and has burned himself badly, so his doctor told him not to go near a stove or anything hot. He said that anything cooked for him cannot be hot, but must be tepid, because he has burned his hands and fingers by grabbing a hot bowl. (Tr. 582).

Hallaron testified that he cannot shop for groceries by himself and that the aides help him with that. He stated that he does not drive anymore and that his driver's license was taken away by the state because of the medications he takes. He said he was driving with his wife and two neighbor children one day and his motor functions or nerve synapses went dead, his arms dropped and he could not feel anything or even call out. He stated that he was finally able to put his foot on the brake and stop the car, and then went to the emergency room, where the doctor told him that he has Lou Gehrig's disease.[3] Plaintiff said he has had other accidents, such as when he fell out of the shower, landed between the shower and the toilet, and was knocked unconscious for more than

---

[3]Baseball player Lou Gehrig's "career ended in 1939 when he learned that he was suffering from a rare form of paralysis–amyotrophic lateral sclerosis. In the years following his death the disease became popularly known as Lou Gehrig's disease." MedlinePlus Medical Dictionary, http://www.merriam-webster.com/medlineplus/Lou%20Gehrig's%20disease (last visited May 31, 2013). Amyotrophic lateral sclerosis is "a rare fatal progressive degenerative disease that affects pyramidal motor neurons, usually begins in middle age, and is characterized especially by increasing and spreading muscular weakness." Id. http://www.merriam-webster.com/medlineplus/amyotrophic+lateral+sclerosis (last visited May 31, 2013).

four hours before he was found.  He testified that he was taken to Tulane Medical Center and put on intravenous morphine.  He stated that, when he regained consciousness at the hospital, the doctor said that he had Lou Gehrig's disease and that eventually his condition would worsen.

Plaintiff testified that his condition embarrasses him in public and that he does not like going out in public anymore.  (Tr. 583).  He said he has problems with tremors that come in sudden attacks of involuntary movements, prevent him from being able to speak properly and are very embarrassing because people stare at him.  He stated that the nurse, family or friends who are with him gather around to keep other people from seeing him, because "it gets very serious to the point to where they have to call the paramedics, and they have to take me to the emergency room."

Hallaron said the tremors can come on without warning and are more rapid when he is under stress or upset.  He stated that his doctors told him not to get upset or stressed out and that he should not be in arguments or get involved in other people's situations, but should take care of himself because it is going to get worse.  He testified that he has frequent episodes of temporary paralysis, but could not explain what he meant by "frequently" because "I don't keep a time clock."  He said that such an episode occurs without warning.  (Tr. 584).

When asked whether he has problems with his memory, plaintiff responded that he had a very bad birth and was born with multiple defects.  He stated that he was in a

near-fatal car accident when a drunk driver hit his car and he was bedridden for a year afterwards. He said he was working for Louisiana Rehabilitation Services at the time and that his "health just plummeted" after that. He recalled that the accident happened on May 1st, but was unsure of the year, saying it was possibly in 1995.

When asked whether he has problems following instructions, Hallaron stated that it is embarrassing because he is unable to follow simple instructions or live a normal, decent, human life. (Tr. 585). He said he has problems with his attention in that he forgets doctor's appointments, when to pay bills and "a lot of things."

Plaintiff testified that he needs to use a wheelchair and a walker because he has a neurological impairment and orthopedic impairments in his back and both arms. He said he recently had surgery on his left hand and that he has nerve damage in all of his extremities. He stated he was not sure what caused the nerve damage and that he has orthopedic impairments in his arms, hands, knees and feet. He said he wakes up some mornings and has no problems with the bones in his feet, and other mornings he cannot walk because of rheumatoid pain in his feet, knees, hands and fingers. (Tr. 586). He said he suffers with that pain "pretty much every day now."

Hallaron testified that his doctors advised him not to stand by himself. He said his medical records reflect that he was advised to have someone with him. He stated that, "when the medical staff leaves our house, we are required to find a place to be, and usually I'll take to the bed. When they leave, I stay in the bed."

Plaintiff said his ability to sit is limited by pain and that "these chairs are really uncomfortable."  He testified that he does not like going to places, especially Wal-Mart, where there is no place to sit and rest.  He stated that he goes to Wal-Mart but "it's really miserable" because the "buggies you use to ride around in [are] hell on my back."  He stated he feels "like I've been worked over" when he comes home from Wal-Mart and then "I sleep sometimes four[4] hours.  Sometimes I sleep all day, all night, and all the next day."  (Tr. 587).

Hallaron stated that some doctors have said he has multiple sclerosis, while others have said he does not.  He testified that another doctor said he had Lou Gehrig's disease and other doctors "didn't say I didn't.  They just said that [it's] possible it could be something else, but within four years, they'll know.  But they did indicate very strongly that I won't be here long; make the best of what time I have, and fight with all my might."

Plaintiff testified that he graduated from a two-year nursing program at Gretna College.  (Tr. 588).  He said he is right-handed.  (Tr. 589).

C.    Vocational Expert Testimony

A vocational expert, Patricia Riggle, testified at the hearing that the file indicated that plaintiff worked for a short time as a clerk, but there was no information in the file about how the job was performed.  (Tr. 589).

---

[4]This is the transcription, but in this context it probably should be "for" rather than "four."

The ALJ posed a hypothetical of a person of the same age and limited education as plaintiff with no past work experience; who can read, write, add and subtract; lift and carry a maximum of 20 pounds frequently; walk and stand for four to five hours in an eight-hour day in increments of 50 to 60 minutes at a time; and sit for six or more hours in an eight-hour day. The hypothetical person can stoop only occasionally, can grasp and hold objects and can use his fingers for precise work up to two-thirds of a work day, but not continuously, such as on a production line. (Tr. 590). Riggle testified that such a person could perform jobs that exist in significant numbers in the regional and national economy, such as receptionist and information clerk, general office clerk and bookkeeping clerk. (Tr. 590-91).

The ALJ posed a second hypothetical of a person of the same age, education and past work experience with the same residual functional capacity and limitations as in the first hypothetical, but with slight to moderate limitations in the abilities to complete work tasks in a normal work day at a consistent pace and to maintain attention and concentration for an extended period, as a result of a combination of factors, including pain and the effects of medications. The ALJ defined moderate as having some adverse effect on the ability to perform at optimum level for up to one-third of the work day, but at no time precluding work altogether. Riggle stated that this hypothetical person could perform the same jobs as in the first hypothetical. (Tr. 591).

Plaintiff's attorney posed a hypothetical the same as the first of the ALJ's hypotheticals, but with the added limitation that the person's ability to understand, remember and carry out either simple or complex instructions was extremely limited due to severe memory problems.  Riggle stated that if "extreme" means that the person would not be able to complete the work, such a person could not perform any job.  (Tr. 591-92).  Hallaron's counsel then added additional extreme limitations in the hypothetical person's ability to maintain sufficient attention to perform simple repetitive tasks for two-hour blocks of time and to sustain effort and persistence at a normal pace over the course of a 40-hour work week.  Using the same definition of "extreme," Riggle testified that the hypothetical person could not hold down any job.  (Tr. 592).

D.     Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 16-17, 19-22).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.     Plaintiff's Appeal

1.     The ALJ applied the appropriate legal standards in determining that plaintiff's disability had ceased.

Plaintiff argues that the ALJ improperly found him not disabled when the prior comparison point decision and the evidence upon which it was based were lost and not

reconstructed, and the ALJ found that no exception to the medical improvement standard applied.  Hallaron contends that the ALJ erred (1) by not following the entire seven-step process for cessation determinations based on medical improvement, 20 C.F.R. § 416.994(b)(5), and (2) in his use of the additional procedure for a lost file case, id. § 416.994(b)(2)(iv)(e).  Plaintiff argues that medical improvement cannot be found under these standards if a lost file cannot be reconstructed and no exception to the medical improvement standard applies.  He asserts that, in such a case, the presumption of disability based on the earlier determination of disability continues, so that his own disability must be found to continue.

Plaintiff's argument leads to the absurd result that the Commissioner can never find that a person is not disabled if the lost, favorable comparison point file cannot be reconstructed and no exception to the medical improvement standard applies.  The regulations do not require this result, and the court should avoid reading them to produce an absurd result.  Defensor v. Meissner, 201 F.3d 384, 388 (5th Cir. 2000); United States v. Marine Shale Processors, 81 F.3d 1329, 1345 (5th Cir. 1996); United States v. CITGO Petroleum Corp., No. C-06-563, 2011 WL 1155684, at *3 (S.D. Tex. Mar. 28, 2011) (citing Gen. Elec. Co. v. United States, 221 Ct. Cl. 771, 734 (1979); Rucker v. Wabash R.R., 418 F.2d 146 (7th Cir.1969)); GE Capital Commercial, Inc. v. Wright & Wright, Inc., No. 3:09-CV-572-L, 2009 WL 5173954, at *5 (N.D. Tex. Dec. 31, 2009) (citing Dewsnup v. Timm, 502 U.S. 410, 427 (1992)).

Section 416.994(b)(5) provides a procedure to assess whether a previously found disability has medically improved to the point that the claimant is no longer disabled.

> (5) Evaluation steps.  To assure that disability reviews are carried out in a uniform manner, that a decision of continuing disability can be made in the most expeditious and administratively efficient way, and that any decisions to stop disability benefits are made objectively, neutrally, and are fully documented, we will follow specific steps in reviewing the question of whether your disability continues.  Our review may cease and benefits may be continued at any point if we determine there is sufficient evidence to find that you are still unable to engage in substantial gainful activity.  The steps are as follows. . . .
> (i) Step 1.  Do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of subpart P of part 404 of this chapter?  If you do, your disability will be found to continue.
> (ii) Step 2.  If you do not, <u>has there been medical improvement</u> as defined in paragraph (b)(1)(i) of this section?  <u>If there has been medical improvement</u> as shown by a decrease in medical severity, see step 3 in paragraph (b)(5)(iii) of this section.  <u>If there has been no decrease in medical severity, there has been no medical improvement</u>. (See step 4 in paragraph (b)(5)(iv) of this section.)
> (iii) Step 3.  <u>If there has been medical improvement</u>, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1)(i) through (b)(1)(iv) of this section; i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination.  If medical improvement is not related to your ability to do work, see step 4 in paragraph (b)(5)(iv) of this section.  If medical improvement is related to your ability to do work, see step 5 in paragraph (b)(5)(v) of this section.
> (iv) Step 4.  <u>If we found at step 2 in paragraph (b)(5)(ii) of this section that there has been no medical improvement</u> or if we found at step 3 in paragraph (b)(5)(iii) of this section that the medical improvement is not related to your ability to work, <u>we consider whether any of the exceptions in paragraphs (b)(3) and (b)(4) of this section apply.  If none of them apply, your disability will be found to continue</u>.  If one of the first group of exceptions to medical improvement applies, see step 5 in paragraph (b)(5)(v) of this section.  <u>If an exception from the second group of</u>

<u>exceptions to medical improvement applies, your disability will be found to have ended.  The second group of exceptions to medical improvement may be considered at any point in this process.</u>

(v) Step 5.  If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 416.921). This determination will consider all your current impairments and the impact of the combination of these impairments on your ability to function.  If the residual functional capacity assessment in step 3 in paragraph (b)(5)(iii) of this section shows significant limitation of your ability to do basic work activities, see step 6 in paragraph (b)(5)(vi) of this section.  When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature.  If so, you will no longer be considered to be disabled.

(vi) Step 6.  If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with § 416.960.  That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past.  If you can do such work, disability will be found to have ended.

(vii) Step 7.  If you are not able to do work you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment made under paragraph (b)(5)(vi) of this section and your age, education, and past work experience (see paragraph (b)(5)(viii) of this section for an exception to this rule).  If you can, we will find that your disability has ended.  If you cannot, we will find that your disability continues.[5]

20 C.F.R. § 416.994(b)(5) (emphasis added).

The fraud exception is one of the "second group of exceptions to medical improvement" mentioned in Step 4, under which the Commissioner may order a

---

[5]There is an eighth step regarding past relevant work that cannot apply in this case, as Hallaron has no past relevant work.

cessation of benefits <u>without</u> a determination that the claimant has experienced medical

improvement or can engage in substantial gainful activity.

> (4) Second group of exceptions to medical improvement. . . .  [T]he
> following exceptions may result in a determination that you are no longer
> disabled.   In these situations the decision will be made without a
> determination that you have medically improved or can engage in
> substantial gainful activity.
> (i) A prior determination or decision was fraudulently obtained.  If we find
> that any prior favorable determination or decision was obtained by fraud,
> we may find that you are not disabled.

<u>Id.</u> § 416.994(b)(4)(i).

Hallaron argues that the ALJ erred by failing to find at Step 2 that there had been

no medical improvement, which would then direct the ALJ to proceed to Step 4, and that

the ALJ erred by failing to find at Step 4 that plaintiff's disability continued, when the

ALJ found that the Group II fraud exception does not apply.  After finding that the fraud

exception does not apply, which the regulation plainly states can occur at any step, the

ALJ found that Hallaron has not been under a disability since August 1, 2009, the date

when the agency initially found that cessation of disability occurred.

The ALJ properly applied the law when he acknowledged that the previous file

could neither be located nor reconstructed, and then engaged in the special procedure for

such cases.  Under that special procedure, the ALJ first found that Hallaron is able to

engage in substantial gainful activity and then that the prior file cannot be reconstructed.

> (E) Prior file cannot be located.  <u>If the prior file cannot be located, we will
> first determine whether you are able to now engage in substantial gainful</u>

<u>activity based on all your current impairments</u>. (In this way, we will be able to determine that your disability continues at the earliest point without addressing the often lengthy process of reconstructing prior evidence.) If you cannot engage in substantial gainful activity currently, your benefits will continue unless one of the second group of exceptions applies (see paragraph (b)(4) of this section). <u>If you are able to engage in substantial gainful activity, we will determine whether an attempt should be made to reconstruct those portions of the missing file that were relevant to our most recent favorable medical decision</u> (e.g., work history, medical evidence from treating sources and the results of consultative examinations). This determination will consider the potential availability of old records in light of their age, whether the source of the evidence is still in operation, and whether reconstruction efforts will yield a complete record of the basis for the most recent favorable medical decision. <u>If relevant parts of the prior record are not reconstructed either because it is determined not to attempt reconstruction or because such efforts fail, medical improvement cannot be found.</u> The documentation of your current impairments will provide a basis for any future reviews. If the missing file is later found, it may serve as a basis for reopening any decision under this section in accordance with § 416.988.

<u>Id.</u> § 416.994(b)(2)(iv)(E) (emphasis added).

Hallaron argues that, because the ALJ found that the fraud exception does not apply and the file cannot be reconstructed, "medical improvement cannot be found," which he construes to mean that his disability must be found to continue because of the presumption of continued disability. However, the lost file regulation does <u>not</u> say that the Commissioner <u>must</u> find that a <u>disability continues</u> when the file cannot be reconstructed and no exception to the medical improvement standard applies. Rather, Section 416.994(b)(2)(iv)(E) says that the Commissioner <u>cannot find</u> that <u>medical improvement</u> has occurred in these circumstances.

21

This is reasonable because medical improvement is defined as a decrease in the medical severity of an impairment that was present at the time of the most recent favorable disability determination. The ALJ found nothing in the current medical records that provided any evidence for the basis of the 1997 favorable determination. (Tr. 13). The ALJ could not determine whether any decrease in severity, i.e., medical improvement, occurred in the 14 years since the comparison point decision because the prior file is lost and cannot be reconstructed. He therefore could not answer the Step 2 question of 20 C.F.R. § 416.994(b)(5) of whether there has, or has not, been medical improvement. He would only proceed to Step 4 of the medical improvement standard "[i]f we found at step 2 in paragraph (b)(5)(ii) of this section that there has been no medical improvement." Because he could not answer the Step 2 question, he could not proceed to Step 4, which is the only step stating that "your disability will be found to continue" if all of the conditions precedent are met.

Thus, because of the inability to reconstruct the lost file from 1997 and the concomitant inability to determine whether medical improvement had occurred, the ALJ did not find that medical improvement had occurred and did not continue to use the medical improvement standard after finding that the fraud exception does not apply. Instead, he "perform[ed] a full sequential evaluation pursuant to 20 C.F.R. § 416.920(a)" based on the current evidence (Tr. 13) and found that plaintiff has not been disabled since August 1, 2009.

The Commissioner has promulgated regulations, including 20 C.F.R. § 416.920, that provide procedures for evaluating a claim and determining disability in the first instance. Id. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2011). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. Id. §§ 404.1520, 416.920; Perez, 415 F.3d at 461; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[6] The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Perez, 415 F.3d at 461.

The claimant has the burden of proof under the first four parts of the inquiry. If he successfully carries this burden, the burden shifts to the Commissioner to show that

---

[6]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence. Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

other substantial gainful employment is available in the national economy that the claimant is capable of performing. When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding. Id.; Newton, 209 F.3d at 453.

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) his age, education, and work history." Martinez, 64 F.3d at 174.

The ALJ reviewed the extremely voluminous record and followed the five-step evaluation procedure to determine whether Hallaron is disabled based on his current impairments. The ALJ did not find that plaintiff experienced medical improvement, a finding that simply cannot be made in the absence of the lost or reconstructed file when the comparison point decision was made so long ago. The ALJ was not required to use the seven-step medical improvement procedure in these circumstances.

Accordingly, plaintiff's first assignment of error lacks merit.

> 2. The "fraud" label on the front of the case file did not deprive plaintiff of a neutral and objective hearing and decision.

Hallaron argues that the "fraud" label on the front of the case file deprived him of a neutral and objective hearing and decision. See 20 C.F.R. § 498.204(a) ("The ALJ will conduct a fair and impartial hearing, avoid delay, maintain order and assure that a record

24

of the proceeding is made.").  The ALJ himself identified the label on the record at the hearing and stated that "it doesn't influence me in any way, and I have absolutely no problem approaching this case with an open mind."  (Tr. 574-75).

The ALJ is entitled to a presumption of neutrality and objectivity, and plaintiff bears the burden to rebut that presumption.  Crenshaw v. Apfel, 214 F.3d 1350, 2000 WL 634084 (5th Cir. May 3, 2000) (citing Schweiker v. McClure, 456 U.S. 188, 195-96 (1982); Muse v. Sullivan, 925 F.2d 785, 790 (5th Cir. 1991)).

Hallaron has not identified any evidence to contradict either the presumption of neutrality or the ALJ's specific statement that he had nothing to do with the fraud label and was approaching the case with an open mind.  The ALJ performed a detailed analysis of the voluminous record, including the report of the Cooperative Disability Investigations Unit of the Office of the Inspector General on which the disability hearing officer had previously based a decision that the fraud exception to the medical improvement standard applied.   The ALJ expressly rejected that conclusion as unsupported by the record (Tr. 13), but considered the investigative report along with other evidence when assessing plaintiff's credibility and the credibility of the medical opinions under the five-step sequential evaluation for determining disability.  The ALJ must assess the record as a whole to assess credibility during that evaluation.  Salgado v. Astrue, 271 F. App'x 456, 462 (5th Cir. 2008) (citing SSR 96-7P,  1996 WL 374186, at *1 (July 2, 1996)); Hoelck v. Astrue, 261 F. App'x 683, 686 (5th Cir. 2008) (citing

Hollis v. Bowen, 837 F.2d 1378, 1384-85 (5th Cir. 1988); Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995)).

Accordingly, this assignment of error lacks merit.

> 3.    The ALJ did not improperly accept the lay observations of the Cooperative Disability Investigations Unit of the Office of the Inspector General over the medical findings and opinions of the psychological consultative examiner.

The ALJ found that plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms are not credible and lack any substantive support in the record. (Tr. 18). After discussing why the evidence of record failed to support plaintiff's allegations (Tr. 18-21), the ALJ additionally stated that Hallaron's "credibility is further undermined by the findings set forth in the August 6, 2009 Report of Investigation by a special agent from the Cooperative Disability Investigations Unit, Office of the Inspector General." (Tr. 21). Hallaron argues that the ALJ erred by accepting the lay observations of the investigators over the medical findings of the psychological consultative examiner, Thomas M. Welsh, Ph.D., based on his July 6, 2009, examination. (Tr. 235-38).

The ALJ "fully considered" Dr. Welsh's report, in which the psychologist found, without having reviewed any medical records, without any psychological testing and based solely on a mental status examination, that plaintiff has severe problems with his short-term memory and concentration. Dr. Welsh diagnosed a cognitive disorder, not otherwise specified, as a result of a motor vehicle accident in 1995, and opined that

Hallaron has some marked and some extreme limitations in his ability to handle some of the cognitive functions of working. (Tr. 237). The ALJ found that Dr. Welsh's report was contradicted by the special agent's report of his interactions with Hallaron that occurred within minutes after the consultative examination. The ALJ concluded that "it is apparent that Dr. Welsh was not aware of all relevant factors in this case at the time he issued his report. Consequently, his findings with regard to claimant's cognitive status and functioning are not accorded significant weight. . . . Claimant has been examined by numerous other physicians that he saw on his own initiative. None of those sources has set forth specific functional limitations in reports or clinic notes." (Tr. 22).

As he was required to do, the ALJ considered all of the evidence, including Dr. Welsh's opinions, and weighed the evidence to resolve any conflicts. Escalante v. Astrue, 286 F. App'x 179, 180 (5th Cir. 2008) (citing Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990)); Newton, 209 F.3d at 452; Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994). "[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Newton, 209 F.3d at 455 (quotation omitted); see also 20 C.F.R. § 404.1527(c)(2) ("If any of the evidence in your case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all the other evidence and see whether we can decide whether you are disabled based on the evidence we have."); id. § 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a

27

whole, the more weight we will give to that opinion."); id. § 416.927(c)(6)("When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion."). The opinions of a physician may be assigned little or no weight when good cause is shown. Good cause may permit an ALJ to discount the weight of a physician's opinions relative to other experts where the physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or otherwise unsupported by the evidence. Newton, 209 F.3d at 455-56.

The ALJ's lengthy decision demonstrates that he carefully considered Dr. Welsh's report, but rejected Dr. Welsh's conclusions regarding Hallaron's ability to function in the work setting, primarily based on the credibility of plaintiff's allegations to both Dr. Welsh and his numerous other healthcare providers. The ALJ has the responsibility to evaluate the credibility of witnesses, Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002), and "credibility conclusions are 'precisely the kinds of determinations that the ALJ is best positioned to make.'" Spruill v. Astrue, 299 F. App'x 356, 358 (5th Cir. 2008) (quoting Falco, 27 F.3d at 164). Thus, the ALJ's credibility evaluation is entitled to considerable deference by this court. McKnight v. Astrue, 340 F. App'x 176, 181 (5th Cir. 2009); Bedford v. Astrue, 236 F. App'x 957, 962 (5th Cir. 2007). The ALJ's explanation of his reasons for finding plaintiff not entirely credible is all that is required. James J. Flanagan Stevedores, Inc. v. Gallagher, 219 F.3d 426, 430 & n.8 (5th Cir. 2000)

28

(citing <u>Falco</u>, 27 F.3d at 163); <u>Godbolt v. Apfel</u>, No. 98-1680, 1999 WL 179476, at *9 (E.D. La. Mar. 31, 1999).

The ALJ described in detail why Hallaron's credibility was discredited in multiple ways by the entire record, including, but not only, the special agent's report. These findings are substantially supported by the record and need not be reiterated here. Indeed, my review of the record reveals that it contains more inconsistencies than the ALJ cited in his decision.

The opinions of Dr. Welsh that the ALJ declined to credit are not substantially supported by the record. First, Dr. Welsh did not review any of the other medical records and was limited to relying on the information given to him by plaintiff and his cousin, Martin Alcoser, who accompanied plaintiff to the examination and who exercises plaintiff's power of attorney and handles his finances. Second, Dr. Welsh's report reflects discrepancies between what plaintiff told him on the one hand, and plaintiff's own testimony and the remainder of the record on the other hand.

Hallaron reported to Dr. Welsh that he had an uncomplicated birth and normal early development (Tr. 236), while he testified at the hearing that he had a very bad birth and was born with multiple defects.  (Tr. 585).  Hallaron told Dr. Welsh that he "has been told that he needs back surgery" (Tr. 236), but the medical records contain <u>no</u> such recommendation from any physician.  Indeed, the medical records document the repeated lack of objective clinical findings regarding plaintiff's musculoskeletal back complaints.

29

(Tr. 197, 200, 208, 214, 227-32, 316, 464, 478, 485).  Plaintiff denied any history of substance abuse to Dr. Welsh, while the medical records contain several references to his physicians' suspicions about his prescription drug abuse, which the ALJ also took into account.

Hallaron told Dr. Welsh that he "work[ed] as a private investigator for about two years." (Tr. 236).  The record does not support this statement.  In a Continuing Disability Review form dated December 14, 2008, plaintiff stated that he graduated with highest honors from a Private Investigation/Detective course at Stratford Career College in St. Albans, Vermont in 2005, long after the Commissioner adjudged in 1997 that he continued to be disabled.  (Tr. 90).  Hallaron did not report any experience as a private investigator on the portion of this form for past work.  (Tr. 91).  He stated on the same form that he graduated from Gretna Career College in 2005 with a 3.89 average and that his hobbies included watching forensics on television and reading law books.  (Tr. 90).  These collegiate honors and activities appear to be inconsistent with the memory and concentration problems that plaintiff reported to Dr. Welsh and with Dr. Welsh's findings regarding plaintiff's cognitive abilities.

In sum, the ALJ's numerous reasons for discounting Hallaron's credibility are substantially supported by the medical record and provide good cause for his decision to accord no significant weight to Dr. Welsh's opinions.  Accordingly, this assignment of error lacks merit.

## CONCLUSION

The ALJ applied the appropriate legal standards to determine that Hallaron was not disabled from August 1, 2009 to the date of the decision.  There is no evidence that the "fraud" label on the front of the case file deprived plaintiff of an objective hearing and decision.  The ALJ did not improperly accept the lay observations of the Cooperative Disability Investigations Unit of the Office of the Inspector General over the medical findings and opinions of the psychological consultative examiner, but properly weighed all of the evidence to find that plaintiff is not credible and that Dr. Welsh's opinions are not entitled to significant weight.

## **RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's motion for summary judgment be DENIED and his complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v.

United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[7]

New Orleans, Louisiana, this ____4th____ day of June, 2013.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[7]Douglass referred to the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.